**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                          Case No. 3:18-cr-19-J-20JRK

DONJUAN POWELL

_____/

**REPORT AND RECOMMENDATION**[1]

**I. Status**

This cause is before the Court on Defendant's Amended Motion to Suppress Fruits of Search of 6680 Bennett Creek Drive, Apartment 617 (Doc. No. 44; "Motion"), filed October 26, 2018. The Government filed a response in opposition to the Motion on November 7, 2018. See United States' Response to Defendant's Amended Motion to Suppress (Doc. No. 49; "Response"). An evidentiary hearing on the Motion was held on November 14, 2018. See Clerk's Minutes (Doc. No. 51; "Evidentiary Hearing Minutes"); Transcript of November 14, 2018 Evidentiary Hearing (Doc. No. 57; "Tr."), filed December 7, 2018. Thereafter, the parties filed supplemental memoranda in support of their respective positions. See Motion to Suppress Supplemental Memorandum (Doc. No. 63; "Def.'s Supp. Mem."), filed December 28, 2018; United States' Supplemental Memorandum in Response to Defendant's Motion to Suppress (Doc. No. 64; "Govt.'s Supp. Mem."), filed January 17, 2019.

---

[1]    "Within 14 days after being served with a copy of the recommended disposition [of a motion to suppress evidence], … a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). "Failure to object in accordance with this rule waives a party's right to review." Id.; see also 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

## II. Procedural Background

Defendant was charged on January 31, 2018 in a one-count indictment with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). See Indictment (Doc. No. 1). On the same date, the Government filed a Motion for Capias (Doc. No. 2) that the Court granted. See Order (Doc. No. 3), entered January 31, 2018. On June 5, 2018, a Writ of Habeas Corpus Ad Prosequendum (Doc. No. 7) was issued. On June 18, 2018, Defendant made his initial appearance and was arraigned. See Clerk's Minutes (Doc. No. 9). He pleaded not guilty. Id. On September 4, 2018, Defendant filed a Motion to Suppress (Doc. No. 23; "Original Motion"). The Government filed its Response to Defendant's Motion to Suppress (Doc. No. 29) on September 20, 2018. The undersigned held a status hearing on September 24, 2018 at which Defendant was present. See Clerk's Minutes (Doc. No. 31). At that hearing, an evidentiary hearing on the Original Motion was scheduled for October 11, 2018. See id.; Notice of Hearing (Doc. No. 32), entered September 24, 2018. On October 9, 2018, Defendant filed an Unopposed Motion to Continue Motion to Suppress Hearing Set for October 11, 2018 (Doc. No. 39) that the undersigned granted. See Order (Doc. No. 40), entered October 10, 2018. As a result, a status hearing was scheduled for October 11, 2018 in place of the suppression hearing. See Order (Doc. No. 40).

During the October 11, 2018 status hearing, at which Defendant was present, counsel for Defendant represented that Defendant intended to file an amended motion to suppress. See Clerk's Minutes (Doc. No. 41). The undersigned entered an Order (Doc. No. 42) directing Defendant to file the amended motion to suppress no later than October 26, 2018.

Thereafter, the instant Motion and Response were filed, the evidentiary hearing was held, and the supplemental memoranda were filed. The Court heard oral argument on February 20, 2019. See Clerk's Minutes (Doc. No. 69); Transcript of Oral Argument (Doc. No. 70; "OA Tr."), filed February 22, 2019. At oral argument, Defendant raised an alternative ground for suppression relying mainly on United States v. Hernandez-Penaloza, 899 F. Supp. 2d 1269 (M.D. Fla. 2012). See Tr. at 42-48.

In light of this new ground for suppression, the Court directed the parties to submit supplemental memoranda addressing Hernandez-Penaloza. See Clerk's Minutes (Doc. No. 69); OA Tr. at 92. On March 7, 2019, the Government filed its Supplemental Memorandum (Doc. No. 78). On March 29, 2019, Defendant filed a memorandum in response. See Defendant's Memorandum in Response to Government's Supplemental Memorandum (Doc. No. 83). The Motion is now ripe for consideration.

### III. Summary of Issues and Recommendation

This case involves a January 16, 2018 warrantless search of the apartment ("the Apartment") of Carllisa Williams, with whom Defendant was in a casual relationship at the time. On that date, law enforcement arrived at the Apartment to execute a state arrest warrant for Defendant. After Defendant was arrested, law enforcement searched the Apartment and found a number of items allegedly belonging to Defendant, including a firearm, ammunition, and illegal drugs. The search was based solely on Ms. Williams's consent, which was given after she and Defendant exited the Apartment.

In the Motion, Defendant seeks to suppress all evidence obtained from the search, contending it violated the Fourth Amendment because Ms. Williams's consent was not given voluntarily. Alternatively, relying on Hernandez-Penaloza, counsel for Defendant asserted

at oral argument that Ms. Williams was illegally detained because the officers did not have the authority to order her out of the Apartment without a search warrant. OA Tr. at 43-44. Counsel also suggested that the officers did not have the authority to order Defendant out of the Apartment to arrest him without a search warrant. OA Tr. at 44. Thus, argued counsel, the illegal seizures tainted Ms. Williams's consent. OA Tr. at 43-45.[2]

The Government first challenges Defendant's standing to contest the search. As to the voluntariness of the consent, the Government argues that the testimony of the law enforcement officers should be credited over Ms. Williams's, which, according to the Government, would support a finding that Ms. Williams's consent was voluntary. As to Defendant's alternative ground for suppression, the Government contends that Ms. Williams was not illegally detained because she was not coerced to exit the Apartment and that the officers lawfully arrested Defendant at the Apartment because they reasonably believed he was present at the Apartment.

As an initial matter, the undersigned concludes that Defendant has standing to challenge the search of the Apartment. Regarding Ms. Williams's consent, the undersigned finds that it was not voluntary. In making the voluntariness finding, various portions of the testimony of the law enforcement officers are discredited and Ms. Williams's testimony is credited in all material respects. As to the parties' arguments regarding Hernandez-Penaloza, they are more appropriately addressed in relation to Defendant's Motion to

---

[2]    At the end of the suppression hearing, counsel for Defendant stated Defendant was withdrawing the first and second arguments in the Motion regarding the consent of a cotenant and the scope of the consent. Tr. at 229-30; see also Order (Doc. No. 52), entered November 16, 2018, at 1. Defendant's sole remaining arguments are that the consent obtained was not voluntarily given and the newly raised argument that the consent, even if voluntary, was tainted by Ms. Williams's illegal detention and/or Defendant's illegal arrest. (Because counsel for Defendant withdrew the arguments after all the witnesses had testified, some of the testimony that was elicited focused on those arguments that are no longer at issue.)

Suppress Evidence Recovered Through Tracking of Cellular Telephone Based upon a Defective Warrant (Doc. No. 81; "Second Motion to Suppress"), filed March 21, 2019.[3]

### IV. Evidentiary Hearing / Findings of Fact[4]

The Government presented five witnesses during the evidentiary hearing: Michelle Wooden;[5] Sergeant Matthew Doherty;[6] Detective Isaiah Fields;[7] Officer Christopher Bailey;[8]

---

[3]      In the Second Motion to Suppress, Defendant argues the officers located Defendant using information obtained as a result of a defective warrant authorizing the tracking of Defendant's cellphone. See generally Second Motion to Suppress at 1-9. Whether that warrant was valid may impact whether Defendant was lawfully arrested. Thus, the issue of whether the consent was tainted by an illegal seizure of Ms. Williams and/or Defendant is better addressed in considering the issue of the overall lawfulness of Defendant's arrest raised in the Second Motion to Suppress.

[4]      Due to conflicting testimony regarding critical facts, the undersigned makes a number of credibility determinations. In making credibility determinations, the Court considers various factors including a witness's demeanor, the consistencies or inconsistencies within the witness's testimony, and any interest the witness may have in the outcome of the hearing; but the Court does not consider the official rank or status of the witness. United States v. Ramirez-Chilel, 289 F.3d 744, 749-50 (11th Cir. 2002); see also Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985) (indicating various factors to consider when making credibility determinations, such as demeanor, inflection of voice, and whether the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it").

[5]      Ms. Wooden is a probation officer with the Florida Department of Corrections in Jacksonville, Florida. Tr. at 17. She was Defendant's probation officer at the time the arrest warrant for Defendant was issued. See generally Tr. at 20-35. Most of Ms. Wooden's testimony is not necessary to resolve the issues raised in the Motion and supplemental memorandum that are pending before the Court; as such, Ms. Wooden's testimony is not cited often.

[6]      Sergeant Doherty has been employed by the Jacksonville Sheriff's Office ("JSO") since October 2000 and has been a sergeant since May 2014. Tr. at 73-74. Before becoming a sergeant, he was a detective in the criminal apprehension unit. Tr. at 74. He is assigned to the SWAT unit. Tr. at 74. He and the SWAT unit "look for forcible felons for the detective division, . . . handle SWAT callouts for the city of Jacksonville, and serve high-risk search warrants." Tr. at 74. He and the individuals who work for him in the SWAT unit receive specialized training once a week. Tr. at 74. This includes "learning how to apprehend violent criminals, firearms training, [and] close-quarter combat training." Tr. at 75.

[7]      Detective Fields has been employed by JSO for more than eighteen years. Tr. at 118. He is assigned to the "gang unit," and he has been in that unit for about two years. Tr. at 118. In that unit, he "identif[ies], track[s], and keep[s] record of known gang members and their associates and their gangs within Jacksonville." Tr. at 118. Detective Fields is the officer "in charge of the case on [Defendant]." Tr. at 99.

[8]      Officer Bailey has been employed by JSO for six years. Tr. at 168. He is assigned to the SWAT unit, and he has been in the SWAT unit for more than two years. Tr. at 168. He was in the SWAT unit at the time of the search.

and Ms. Williams.[9] In addition, the Government submitted seven exhibits that were received into evidence with no objection from Defendant. See Evidentiary Hearing Minutes at 2. Defendant presented no witnesses and submitted no exhibits. See id.

The credibility of Ms. Williams and the law enforcement officers is at the heart of the voluntariness issue. A detailed discussion of that testimony is necessary to determine whether Ms. Williams's consent was voluntarily given. For ease of discussion and by way of background, the undersigned initially summarizes Ms. Williams's testimony regarding her relationship with Defendant at the time of the search. Then, the witnesses' testimony on the circumstances surrounding the arrest of Defendant, Ms. Williams's consent to search the Apartment, and the search of the Apartment is set out.

**A. Ms. Williams's Testimony Regarding Relationship with Defendant**

Ms. Williams met Defendant on Facebook a "couple [of] months" before the day of the search. Tr. at 190; see also Tr. at 190 (confirming she met Defendant a "few" months before the day of the search). Defendant began going to the Apartment in November 2017, about two months before the day of the search. Tr. at 190. He did not live with Ms. Williams. Tr. at 192. Only Ms. Williams lived at the Apartment. Tr. at 186. Defendant did not have a key to the Apartment, he did not pay rent, he did not receive mail at the Apartment, and he did not pay for utilities. Tr. at 193, 195. He went to the Apartment only when Ms. Williams was there to let him in. Tr. at 195-96.

---

[9]     Ms. Williams was twenty-seven years old at the time of the hearing. Tr. at 183. In October 2015, she graduated from Chamberlain College of Nursing with a bachelor's degree. Tr. at 183. She has been employed as a nurse for two and a half years. Tr. at 183. She works as a registered nurse at UF Health. Tr. at 183-84. She worked there before obtaining her degree and has worked there for four or five years. Tr. at 184. She works three days a week, typically Sunday, Monday, and Tuesday, from 7:00 AM to 7:00 PM. Tr. at 185.

Defendant visited Ms. Williams at the Apartment a "couple nights out of the week." Tr. at 192. He sometimes went there during the day, and he communicated with Ms. Williams via telephone beforehand. Tr. at 193. "Sometimes he would stay the night; sometimes he would leave." Tr. at 193. Some days, if Defendant spent the night at the Apartment and Ms. Williams had to go to work in the morning, she would leave Defendant a key so he could put it under the mat for her when she came back from work. Tr. at 194. Defendant could not have visitors at the Apartment when Ms. Williams was not there. Tr. at 196-97. Defendant did not usually bring clothes with him when he spent the night. Tr. at 200. He kept a "few items" at the Apartment, "but not many." Tr. at 200. Ms. Williams specified it was "[p]robably a shirt or pants, something." Tr. at 200. Defendant kept no toiletries at the Apartment. Tr. at 200-01. He used one of Ms. Williams's "extra toothbrushes." Tr. at 201.

Defendant went to the Apartment about 10:00 PM or 11:00 PM the night before the day of the search. Tr. at 196. He did not bring a change of clothes that night. Tr. at 200. He spent the night at the Apartment and was still there when law enforcement officers arrived the next morning. Tr. at 196.

**B. The Arrest, Consent to Search, and Search**

On October 9, 2017, a state circuit judge issued an arrest warrant for Defendant based on Defendant's alleged violations of his conditions of probation. Tr. at 32; <u>see</u> Govt.'s Ex. 1B (Doc. No. 51-3) (arrest warrant). That warrant was recalled because two of the offenses for which Defendant was on probation (Counts III and IV) were incorrect on the warrant. Tr. at 38-41. An amended arrest warrant was then issued on December 11, 2017 with the correct alleged violations. <u>See</u> Tr. at 42; Govt.'s Ex. 2B (Doc. No. 51-5) (amended arrest warrant).

In late December 2017 or early January 2018, Detective Fields listened to a jail telephone call between an inmate and Defendant. Tr. at 119-20. Listening to jail calls is a way for detectives to "gain intelligence." Tr. at 119. Detective Fields decided to "check[ ] on [Defendant,] and [he] observed he had a warrant in the system." Tr. at 119. After that, Detective Fields began to "put together information" about Defendant, "where to find him" and "how to track him." Tr. at 119. Detective Fields did not check the specifics of the arrest warrant, but he "knew it was for violation of probation . . . ." Tr. at 149.

On the morning of January 16, 2018, Detective Fields was informed of Defendant's location by the Florida Department of Law Enforcement ("FDLE"). Tr. at 151-52. Defendant's location was determined via electronic surveillance. Tr. at 150. Because Detective Fields was aware of Defendant's criminal history and because he believed Defendant was a gang member, carried a gun, and had been involved in shootings, Detective Fields "recognized this would be a job for the SWAT team, the criminal apprehension team, to help in apprehending him." Tr. at 121-22. Detective Fields testified that the gang unit calls a SWAT team "[o]nly on high-profile, high-risk" gang members. Tr. at 143-44. On that day, January 16, 2018, Detective Fields spoke with Sergeant Doherty and asked for the SWAT unit's assistance in arresting Defendant. Tr. at 122 (Detective Fields's testimony); Tr. at 76-77 (Sergeant Doherty's testimony). According to Detective Fields, he relayed to the SWAT unit the information he had gathered on Defendant, including that Defendant was a gang member and possessed firearms. Tr. at 123.

Sergeant Doherty testified he was "not familiar with the particulars of the case that led [them] there; only that [the SWAT unit was] notified [its] assistance was required." Tr. at 97. According to Sergeant Doherty, Detective Fields informed him that Defendant had previously

-8-

been "listed as" a person of interest in a homicide. Tr. at 99-100. Sergeant Doherty was notified of the basis for the arrest warrant, but he did not recall "the specifics of it." Tr. at 96. He knew Defendant was on probation at the time, but he did not know "the specifics" of that either. Tr. at 97. Sergeant Doherty testified that Defendant's arrest was considered a high-risk arrest for several reasons, including Defendant's criminal history, that he was known to be armed, and that he was a person of interest in a homicide. Tr. at 97-98.

After speaking with Detective Fields, Sergeant Doherty "gathered up multiple different detectives from different squads that [were working] on the same day" to form the team that would assist in arresting Defendant. Tr. at 76-77. Once the SWAT team was selected and organized, Detective Fields informed its members that Defendant was in an apartment at 6680 Bennett Creek Drive, Jacksonville, Florida. Tr. at 80; see Motion at Ex. A (Doc. No. 44-1) (arrest and booking report indicating the Apartment's address). Sergeant Doherty knew that this was not Defendant's address and that Defendant resided elsewhere. Tr. at 101.

Sergeant Doherty and the SWAT team deployed to the apartment complex. Tr. at 78. They "set up a perimeter" around the area where they believed Defendant was located. Tr. at 78; see also Tr. at 80-81. The uniform for the SWAT team consists of "jeans and a T-shirt," but when a team goes to a scene, they "don a black vest with 'Police' markings on the front and back." Tr. at 95-96; see also Tr. at 111. The vest "typically has a magazine or two on the front with a radio pouch, a gun belt, a pistol, extra magazines, handcuffs, [a] Taser, and then a slung rifle." Tr. at 96. The rifle is a "variant of the AR-15," and it is semiautomatic. Tr. at 96. According to Sergeant Doherty, "probably" ten or fifteen SWAT members participated in the arrest. Tr. at 78; see also Tr. at 96, 152-53. Detective Fields testified he

believed there were only two sergeants there that day: Sergeant Doherty and Sergeant Billy Irvin. Tr. at 124.

Sergeant Doherty testified that after determining the specific apartment where Defendant was located, Sergeant Irvin and "a group of SWAT operators set up an apprehension unit down the hallway from the [A]partment." Tr. at 78. According to Sergeant Doherty, the apprehension unit consisted of four to five officers. Tr. at 110. These officers had "[t]heir pistols . . . in their holsters and they ha[d] their hands on the rifles." Tr. at 109. They held their rifles in a "low ready" position, pointing the barrel down to the ground at a forty-five-degree angle, so they could see any person exiting the Apartment and ensure the person was not armed. Tr. at 108-11.

Detective Fields stated he was in an unmarked unit and "stayed parked near the front office [of the apartment complex], which would be more like an outer perimeter . . . ." Tr. at 124-25. According to Detective Fields, there were "one or two unmarked units" in his vicinity. Tr. at 125. Officer Bailey stated he was in a marked unit with "a few other units," and they "functioned as an outer perimeter of the outside of the apartment complex over off Bennett Creek." Tr. at 169.

Detective Fields contacted the manager of the apartment complex and asked her for information on the person living in the Apartment. Tr. at 123-24. The manager told him the Apartment was rented by Ms. Williams. Tr. at 123-24. Detective Fields "asked [the manager] if she minded giving [them] a phone number so [they] could contact [Ms. Williams]," and the manager gave him Ms. Williams's cellphone number. Tr. at 124. Detective Fields then "passed [the phone number] on [the] radio channel to the SWAT unit." Tr. at 124; see also Tr. at 82, 165-66.

Sergeant Doherty's testimony regarding how Ms. Williams was asked to exit the Apartment was somewhat contradicted by both Detective Fields's and Ms. Williams's testimony. Sergeant Doherty testified that Sergeant Irvin and the apprehension unit "called out to the [A]partment through the breezeway." Tr. at 82; see Tr. at 81. According to Sergeant Doherty, this was done "by voice" and no public address ("PA") system was used. Tr. at 82-83. Detective Fields testified he assumed they contacted Ms. Williams by phone because he had gotten her phone number from the apartment complex manager. Tr. at 166-67. Ms. Williams stated that at about 11:30 AM or 12:00 PM, a sergeant (apparently Sergeant Doherty) called her cellphone, told her there was a suspect in the Apartment, and asked her to exit. Tr. at 187-88.[10] Ms. Williams testified she looked outside her window and saw "guns pointed at the [Apartment]." Tr. at 215-16.

Thereafter, Ms. Williams exited the Apartment. Tr. at 83. According to Ms. Williams, the officers had "[b]ig guns." Tr. at 219. Sergeant Doherty testified that when Ms. Williams exited the Apartment, the members of the apprehension unit were holding their rifles in a low ready position. Tr. at 108-11. One member of the apprehension unit "walked [Ms. Williams] over to [him]." Tr. at 83, 114. Sergeant Doherty testified that Ms. Williams was not handcuffed, but she was not free to go. Tr. at 114. Sergeant Doherty asked Ms. Williams whether Defendant was in the Apartment, and she said he was. Tr. at 83. Sergeant Doherty then explained to Ms. Williams that Defendant had a "felony warrant for his arrest," and according to Sergeant Doherty, she "was obviously unaware of that." Tr. at 83. He also asked her whether there were any firearms, other people besides Defendant, or animals in

---

[10]     Ms. Williams testified the sergeant who called her was at the hearing earlier, was "tall," and had "gray hair." Tr. at 197. Sergeant Doherty matches the description given by Ms. Williams.

the Apartment. Tr. at 89; see also Tr. at 94. Ms. Williams told him that her personal firearm was in the Apartment. Tr. at 89-90.[11] She described the firearm and its location. Tr. at 89-90. Ms. Williams also stated there was no one in the Apartment other than Defendant. Tr. at 89. Sergeant Doherty testified that "at some point" during this conversation, Ms. Williams "might have gotten a phone call," but Sergeant Doherty "asked her to hang up the phone because [he] was busy talking to her about what was going on inside." Tr. at 115.[12]

According to Sergeant Doherty, Defendant then called Ms. Williams's cellphone while she and Sergeant Doherty were talking. Tr. at 83-84. Sergeant Doherty asked Ms. Williams for the cellphone, and she gave it to him. Tr. at 84. Sergeant Doherty told Defendant over the phone, "I'm Sergeant Doherty with the [JSO] SWAT team. You have a felony warrant for your arrest. You have five minutes to exit the structure[,] and I'll guarantee your safety." Tr. at 84. Sergeant Doherty gave him this instruction because Defendant had a warrant for his arrest and because Sergeant Doherty was aware that Defendant "was known to be armed" and that at some point "he was a person of interest in a homicide." Tr. at 86. The other law enforcement officers on the scene also knew this information. Tr. at 86.

Again, Sergeant Doherty's testimony regarding how Defendant was directed to exit the Apartment is inconsistent with both Detective Fields's and Ms. Williams's testimony. Ms. Williams testified that when she met with Sergeant Doherty, he asked her if Defendant was in the Apartment, and when she responded that he was, Sergeant Doherty "called him out on the bullhorn." Tr. at 198. According to Ms. Williams, Sergeant Doherty used the name

_____

[11]     Ms. Williams testified that no one asked her if there were any firearms in the Apartment, but that she told the officers she had a firearm in the Apartment when they were "about to go in to search" because she did not "want them to be alarmed that [her] gun was sitting on the dresser." Tr. at 213.

[12]     Ms. Williams did not testify to this; rather, she stated she called her cousin and mother while the officers were directing Defendant to exit the Apartment. Tr. at 199.

"Marlow" (apparently Defendant's "Facebook name") to call him. Tr. at 199. Detective Fields also testified that from "what [he] could hear" from his vehicle, he thought they used the PA system to call out Defendant. Tr. at 164, 166. Neither of them testified that Defendant was asked on the phone to exit.

While Sergeant Doherty waited for Defendant to exit, he and the other SWAT officers had their pistols in holsters and their rifles slung across their bodies. Tr. at 88. Sergeant Doherty testified this is standard procedure for executing a felony arrest warrant when individuals with a background like Defendant's are involved. Tr. at 88.

Ms. Williams testified that while Sergeant Doherty was calling Defendant on the bullhorn, she was "sitting on the side of the curb." Tr. at 199; see also Tr. at 198. Ms. Williams talked on the phone with her cousin and her mother while she was sitting there. Tr. at 199. Ms. Williams first called her cousin to ask her to come to the scene because she lived nearby. Tr. at 200. Ms. Williams then called her mother to talk to her about what was happening. Tr. at 200.

Sergeant Doherty did not recall Ms. Williams's specific location while the officers were waiting for Defendant to exit the Apartment, but he stated Detective Fields was "standing with her." Tr. at 87.[13] Sergeant Doherty testified that within "a matter of minutes" after he spoke with Defendant on the phone, Defendant exited the Apartment, Tr. at 87, and was "received by the apprehension squad," Tr. at 88-89.

---

[13] Sergeant Doherty's testimony that Detective Fields was with Ms. Williams is contradicted by Detective Fields, who testified he went to the scene after he learned Defendant had been arrested. Tr. at 126 (explaining that after Defendant was arrested, he (Detective Fields) "c[a]me forward and kind of t[oo]k over" because "[b]y then the SWAT team had probably -- should have already made the scene safe . . .").

When Officer Bailey was informed that Defendant had been arrested, he and "the other marked units that were on the exterior went into the apartment complex . . . ." Tr. at 169-70. Officer Bailey stated that once they arrived, Defendant was placed in one of their marked units. Tr. at 170.

Ms. Williams credibly testified as follows regarding how she was asked for her consent to search the Apartment. She stated that "someone mentioned about searching the [A]partment," but she did not recall who it was. Tr. at 201. (It was likely Sergeant Doherty because Ms. Williams later testified that she believed this officer "was the sergeant." Tr. at 204.) She stated there were other officers around her when she was speaking with that sergeant. Tr. at 203-04. She asked the sergeant why they needed to search the Apartment. Tr. at 202. While she was on the phone with her mother, the sergeant was calmly trying to explain to her the need for the search, but she did not recall what he said. Tr. at 202, 226.

Ms. Williams consistently testified on direct examination, on cross examination, and again on redirect examination, that Officer Bailey interrupted the sergeant when he was trying to explain to her why they needed to search the Apartment and that Officer Bailey became "irate." Tr. at 202, 204, 206, 218, 226.[14] According to Ms. Williams, Officer Bailey yelled at her, "Oh, if you don't let me search, everything in the house is going to be charged with you. You're an adult. You can make your own decision." Tr. at 205; see also Tr. at 206 (testifying again, "[Officer Bailey] became irate, was like, you know, 'You're grown. You can make your own decisions. If you don't let us search your house,' you know, blah, blah, blah");

---

[14]    Ms. Williams testified the officer who yelled at her had a beard, was short, and had just walked out of the courtroom before she came in. See Tr. at 206-07, 216, 226. Officer Bailey matches the description given by Ms. Williams, and he was the witness who testified just before Ms. Williams, who walked out of the courtroom as she walked in. Neither party disputes that Ms. Williams was referring to Officer Bailey.

Tr. at 202 (testifying Officer Bailey was "yelling, saying . . . 'We need to search [the A]partment. If you don't let us search [the A]partment . . . this is going to happen to you,' that kind of thing"). Ms. Williams testified Officer Bailey was "kind of like screaming and . . . trying to initiate the search." Tr. at 204. On cross examination, she confirmed that Officer Bailey also yelled at her, "I'm tired of you playing games." Tr. at 216. Ms. Williams stated "they" were "yelling in the background, telling [her] to get off the phone." Tr. at 202.

Ms. Williams did not recall whether Officer Bailey or any other officer said that if she did not consent, they would get a search warrant. Tr. at 216-17. Ms. Williams testified she did not feel free to leave or like she could discontinue the conversation with the officers. Tr. at 227. According to Ms. Williams, Detective Fields was not in the area at that time. Tr. at 218. She did not recall how many officers were around. Tr. at 218. Ms. Williams testified that the officers "had guns, but [she did not] believe it was like, you know, pointing -- like 'Hands up,' like that." Tr. at 222.

As to the telephone conversation with her mother, Ms. Williams testified she spoke "very briefly" with her mother about what was happening. Tr. at 202. Ms. Williams testified her mother heard the "commotion in the background[,] and she could tell that [Ms. Williams] was nervous, so she said . . . 'Just let them search. You don't have anything to hide, so let them go ahead and search.'" Tr. at 202.

According to Ms. Williams, she had "never really dealt with this so [she] didn't know what to do . . . ." Tr. at 205. She had never had an interaction with law enforcement like the one she had on that day. Tr. at 201, 205. She had never been in criminal trouble before. Tr. at 214. She was embarrassed and humiliated that her neighbors were hearing and seeing what was happening. Tr. at 219. Ms. Williams felt pressured, and she testified that the

situation was "[v]ery stressful." Tr. at 205. She knew Defendant had marijuana in the Apartment. Tr. at 214. She testified she was "sure there would have been some disciplinary action" from her employer had she been charged with possession of marijuana. Tr. at 214. According to Ms. Williams, she could risk losing her nursing license if she were convicted of a drug crime. Tr. at 214.

Ms. Williams testified that "once [Officer Bailey] started yelling and everything," she was nervous and did not "really know what to do[,] so [she] just said, 'Go ahead and search.'" Tr. at 204. Notably, Ms. Williams testified consistently (on direct examination, on cross examination, and again on redirect examination) that it was only after Officer Bailey yelled at and threatened her that she told the officers to "go ahead and search." Tr. at 202, 204, 206-07, 218, 226; see also Tr. at 208. When the Court asked Ms. Williams whether she consented at the point when Officer Bailey was yelling at and threatening her, Ms. Williams said, "[Y]es, because, I mean, he made me feel as though I had to." Tr. at 225. She explained, "[O]bviously I was taking too long for him to agree to consent for them to search, and so that's when he became irate and everything, and that's when I was like, 'Just go ahead and search the [A]partment.'" Tr. at 226; see also Tr. at 205 (testifying, "I'm guessing I was taking too long to give them consent to search, so he began yelling, saying, 'Oh, if you don't let me search, everything in the house is going to be charged with you. You're an adult. You can make your own decision'"). Ms. Williams specified no particular area in the Apartment they could search, she "just said search." Tr. at 207. On redirect examination, Ms. Williams confirmed that aside from Officer Bailey's hostile tone and threat, the other officers spoke to her in a "calm tone of voice." Tr. at 222.

The Government asserts that "after discussing it with her mother, [Ms. Williams] said, 'Go ahead and search.'" Govt.'s Supp. Mem. at 16. This is not necessarily a complete and accurate portrayal of what happened. As noted above, Ms. Williams spoke "very briefly" with her mother, who told her to let the officers search because Ms. Williams had nothing to hide. Tr. at 202. The testimony at the hearing did not indicate that Ms. Williams had any meaningful discussion with her mother. Ms. Williams did not consent because she was following her mother's advice; rather, Ms. Williams's testimony shows it was only after Officer Bailey threatened, yelled at, and pressured her that she told the officers to just "go ahead and search." See Tr. at 202, 204, 206-07, 218, 226. Moreover, contrary to the mother's impression when giving the advice, Ms. Williams did have something to hide: Defendant's marijuana, which Officer Bailey essentially threatened would be used to charge her when he said, "[I]f you don't let me search, everything in the house is going to be charged with you." Tr. at 205. Ms. Williams's mother was evidently unaware of this, perhaps because of Officer Bailey's yelling and the officers telling Ms. Williams to hang up the phone, Tr. at 202, preventing Ms. Williams from having any meaningful discussion with her mother about the situation.

In stark contrast to Ms. Williams's candid, coherent, detailed, and unwavering testimony about the consent conversation, Sergeant Doherty's testimony was hesitant and disjointed; he did not appear to have a good recollection of that part of the conversation he had with Ms. Williams. Toward the end of Sergeant Doherty's direct testimony about his encounter with Ms. Williams, and before he mentioned anything about the consent part of the conversation, he was asked whether he had any further conversation with Ms. Williams after Defendant was taken into custody, and he responded, "If I did, it wasn't anything

detailed that I would remember." Tr. at 89. Then he said, "I'm sorry. I take that back," and he proceeded to testify that he asked Ms. Williams whether there were any firearms, other people, or animals in the Apartment, questions that he then indicated were asked before Defendant was directed to exit the Apartment. See Tr. at 89, 94.

Sergeant Doherty did not mention, and appeared not to recall, the consent conversation until the Government prompted his recollection by specifically asking him whether he "ha[d] any conversation with Ms. Williams about whether or not she would allow law enforcement to search [the A]partment[.]" Tr. at 90. He responded, "Yes." Tr. at 90. When asked to elaborate on the conversation, he responded, "I asked her if she minded if we looked in the [A]partment, or searched the [A]partment. She said no. And then at that point I believe she was -- Detective Fields took over with her and they started working on a consent to search form." Tr. at 90. Sergeant Doherty testified he asked Ms. Williams for her consent to search after Defendant had exited and been placed in the marked patrol car. Tr. at 94; see also Tr. at 90-91. When asked whether he informed Ms. Williams that she had a right to refuse consent to the search, Sergeant Doherty testified, "I don't remember the specific conversation. I think I just asked her if we could look in the [A]partment." Tr. at 105. Sergeant Doherty stated he did not ask Ms. Williams if he could search for anything specific. Tr. at 105-06.

Officer Bailey was not confronted with and did not testify about Ms. Williams's accusation that he interrupted Sergeant Doherty and yelled at and threatened her to obtain verbal consent. Although it is now known that the officer who yelled at and threatened Ms. Williams was Officer Bailey, the Court and counsel for Defendant were not made aware of

this until Ms. Williams testified (after all the officers had testified).[15] Upon questioning by the Court, Sergeant Doherty testified he (Sergeant Doherty) did not tell Ms. Williams that if she did not consent, he would search anyway; he did not tell her he could or would get a search warrant if she did not consent; he did not tell her anything to the effect that if she did not consent, he would charge her with everything he found in the Apartment; he did not tell her he was tired of playing games with her (nor did he hear any officers say anything to that effect); and he heard no officer yell or talk to Ms. Williams in an intimidating voice (as noted below, the undersigned discredits Sergeant Doherty's testimony on this last point). Tr. at 114-16.

Sergeant Doherty testified he and Ms. Williams were using "[j]ust [a] conversational tone" when he asked for her consent to search. Tr. at 91; see also Tr. at 116. In describing

---

[15]    The Court was under the impression, based on the parties' filings before the hearing, that Sergeant Doherty was the officer who was alleged to have yelled at and threatened Ms. Williams. Counsel for Defendant also believed it was Sergeant Doherty. At oral argument, counsel stated as follows:

> I knew from my own pleading that Ms. . . . Williams alleged that she had been threatened and coerced by an officer. She didn't know the names of the officers.
>
> I interviewed her. I never met her in person. I interviewed her over the telephone, and got her statement, which I put as almost verbatim as I could in my motion.
>
> So as the Government was presenting the witnesses, I mistakenly assumed, when I -- when Sergeant Doherty was put on -- and he was the officer who said he received the consent, that this must be the officer who's doing the threatening that I'm told by Ms. Williams that she was threatened by.
>
> . . . .
>
> So then [Officer] Bailey comes on -- the Government puts him on. And he seems to be a witness only about this written consent . . . .
>
> . . . .
>
> I would have crossed [Officer] Bailey or asked about the threats if -- but I thought Sergeant Doherty -- I just assumed -- I wrongly assumed Sergeant Doherty was the one who had made the threats.

OA Tr. at 34-36.

Ms. Williams's demeanor, Sergeant Doherty explained that "she was a little shaken and upset about what was going on, and rightfully so." Tr. at 91. He said she was coherent, "[b]ut she just seemed upset about the event, that the SWAT team was knocking on her door." Tr. at 91. He indicated that Ms. Williams "[a]bsolutely" seemed to understand his request to search the Apartment. Tr. at 91. Sergeant Doherty thought Ms. Williams "was in a situation that she was surprised she found herself in and she was cooperative." Tr. at 116.

Detective Fields testified that he "started making [his] way towards the scene" once he was informed that Defendant had been arrested. Tr. at 126. Defendant was already in a patrol vehicle when Detective Fields arrived at the scene. Tr. at 127. When Detective Fields did arrive, he walked over to where he "saw the sergeant standing and Ms. Williams standing," and Sergeant Doherty informed him he had obtained verbal consent to search the Apartment from Ms. Williams. Tr. at 126-27, 153. Detective Fields acknowledged he did not have probable cause to search the Apartment. Tr. at 153. Detective Fields testified that he did not witness the consent conversation between Sergeant Doherty and Ms. Williams, and he did not know how many officers were around Ms. Williams during that conversation. Tr. at 153, 155-56. Detective Fields did not know whether any voices were raised during this conversation. Tr. at 156. He testified no one made any threats in his presence. Tr. at 156.

Detective Fields described the scene as follows:

> It was -- well, in my opinion, it was casual, a normal -- a normal police scene, people walking coming and going, no -- you know, no one was in a hurry to do anything. It wasn't an active situation where, you know, it was dangerous, so people were just, you know, nonchalantly walking around.

Tr. at 127. Detective Fields stated there were about ten to fifteen officers, and they were all armed. Tr. at 152-53. He testified Ms. Williams was wearing "a T-shirt and a pair of shorts, like ladies' short-shorts that they wear for comfort to bed." Tr. at 165.

Eventually, Detective Fields did speak with Ms. Williams while she was sitting on a curb. Tr. at 127-28. Ms. Williams was cooperative. Tr. at 159. Detective Fields told Ms. Williams that "the reason why all the big presence of the police was there" was that Defendant was a gang member and had "active warrants." Tr. at 128. He told her he was going to search the Apartment based on her consent. Tr. at 131-33; see also Tr. at 128. Ms. Williams said nothing in response. Tr. at 128. Detective Fields testified that "she was open to" the search and that she had no questions. Tr. at 130. He did not advise Ms. Williams she had a right to refuse to consent to the search. Tr. at 153. According to Detective Fields, Ms. Williams told him Defendant had spent the night at the Apartment, and he had done that before. Tr. at 156. Ms. Williams did not receive or try to make any phone calls in Detective Fields's presence. Tr. at 159.

After Detective Fields spoke with Ms. Williams, he and Sergeant Doherty walked to the patrol vehicle where Defendant was, and "Sergeant Doherty opened the rear door" to speak to Defendant. Tr. at 134 (Detective Fields's testimony); see also Tr. at 92 (Sergeant Doherty's testimony). Sergeant Doherty testified that he asked Defendant whether "there was anything in the [A]partment [they] needed to know about" and that Defendant said no. Tr. at 92. Sergeant Doherty could not remember whether he specifically told Defendant that Ms. Williams had consented to the search of the Apartment. Tr. at 92. Detective Fields, however, testified Sergeant Doherty told Defendant that "there was consent to search the [A]partment and asked him if anything illegal was going to be found." Tr. at 134. According

-21-

to Detective Fields—and contrary to Sergeant Doherty's testimony—Defendant told Sergeant Doherty they "would find a small bag of marijuana on the side of the bed." Tr. at 134. Both officers testified that Defendant did not object to the search. Tr. at 93 (Sergeant Doherty's testimony); Tr. at 134 (Detective Fields's testimony). Sergeant Doherty testified Defendant then asked to speak to Ms. Williams, and Sergeant Doherty told him he could not and "shut the door on the vehicle." Tr. at 92.

Officer Bailey testified that Detective Fields informed him Ms. Williams verbally consented to the search of the Apartment, Tr. at 178, and that Detective Fields asked him to retrieve a consent-to-search form to memorialize the consent, Tr. at 170. Officer Bailey's testimony on this point is inconsistent with Detective Fields's. Detective Fields did not recall speaking with Officer Bailey, Tr. at 154-55, and he testified he did not even know how law enforcement obtained the written consent, Tr. at 128.[16] He thought Officer Bailey "had already anticipated" that he (Detective Fields) would ask them to do that so Officer Bailey "had already started getting that together for [him]." Tr. at 129.

Officer Bailey obtained a consent-to-search form from his vehicle for "computers and digital media" (instead of a form to search the premises) because, according to him, it was the only type of form he had that day. Tr. at 171-72; see Govt.'s Ex. 4 (Doc. No. 51-7) (consent-to-search form). Officer Bailey testified that on the day of the search, he told either a senior detective or "one of the supervisors" that he had the wrong form. Tr. at 172. He could not recall who that detective was, but he testified the detective then told him to just ensure that the address of the Apartment was on the form and that Ms. Williams was aware

---

[16]      The consent form states that consent was provided to Detective Fields, see Govt.'s Ex. 4 (Doc. No. 51-7), but this is incorrect. Detective Fields explained that his name was on the form because he "was the case agent[,] and [he] was going to be the one that was doing the main search." Tr. at 129-30.

of her right to refuse consent to search the Apartment. Tr. at 172-73. Officer Bailey did not recall whether he ever told Detective Fields he had the wrong form. Tr. at 179.

Detective Fields testified he "found out . . . not too long ago," just a "few months" before the hearing, that the wrong form was used. Tr. at 131. He stated, "[E]ven through the state court -- the state courts we went through with [Defendant], it was unnoticed." Tr. at 131. (Evidently, Detective Fields was referring to the proceedings related to the state probation violation upon which the state arrest warrant was issued.) Detective Fields testified that after he discovered the wrong form had been used, he spoke with Officer Bailey, and Officer Bailey indicated to him he had not realized it was the wrong form. Tr. at 138, 155. Detective Fields did not think anyone realized on the day of the search that they had the wrong form. Tr. at 138.

Officer Bailey testified he "believe[d]" Ms. Williams was on the sidewalk when he first came in contact with her. Tr. at 177. According to Officer Bailey, he filled out some portions of the consent form, and Ms. Williams stood next to his marked vehicle "so that she could use the trunk of the car to fill out any paperwork." Tr. at 173, 175. Ms. Williams, on the other hand, did not "recall signing anything at the patrol car." Tr at 217. Officer Bailey testified he then "instructed her that she would have to sign it, [that he] would witness it, and that she needed to initial next to the portion that said she had the right to refuse consent to search her property." Tr. at 174. Ms. Williams then initialed and signed the form. See Tr. at 210; Govt.'s Ex. 4 (Doc. No. 51-7) (consent-to-search form). Officer Bailey testified Ms. Williams had no questions about the form. Tr. at 175.

Officer Bailey was questioned by the Government as follows:

Q.      Was anyone around that area in any way yelling or screaming at her, any kind of force or coercion to get her to sign the form?

A.      No, there was not.

Q.      Anyone telling her she would be arrested if she didn't sign it?

A.      Not while she was with me, no.

Q.      At any point that you know of?

A.      No.

Tr. at 176. Officer Bailey denied "hav[ing] any conversation with [Ms. Williams] about her consent to search the [A]partment beyond what was on the form[.]" Tr. at 174-75. He explained he was "under the understanding that they had already got[ten] verbal consent from her and that this was just a secondary action to have it written." Tr. at 175. As explained below, the undersigned discredits this testimony.

The Government did not confront Officer Bailey directly about the statements and threat that Ms. Williams testified he made while she was being asked for verbal consent, see generally Tr. at 168-77, even though the Government prepared both witnesses for their respective testimony, OA Tr. at 18, and knew what Ms. Williams would say at the hearing, OA Tr. at 19. As noted, however, Officer Bailey did testify that he had no conversations with Ms. Williams about her consent beyond what was on the form. Tr. at 174-75. Apparently then, according to Officer Bailey, he was not present when Ms. Williams was asked for verbal consent.

When questioned about the consent-to-search form, Ms. Williams testified that she did not ask any questions and that she did not say she had changed her mind about

consenting to the search. Tr. at 211. Ms. Williams was asked whether she felt like she had a choice whether to sign the consent form, and she replied, "I mean, at that point they had already -- I had already said verbally, 'You can go ahead and consent,' [sic] after everything had [taken] place. So I figured I had no choice, but -- I mean, I'd already let them search." Tr. at 210-11. According to Ms. Williams, she did not even read the form, and she "just remember[ed] them saying 'Sign here, sign there.'" Tr. at 210. She did not recall whether the form was read to her. Tr. at 210.

Sergeant Doherty testified he did not carry consent-to-search forms with him, and he did not ask any officer to give Ms. Williams a form to sign. Tr. at 106-07. According to Sergeant Doherty, after he informed Detective Fields that Ms. Williams consented to the search, he "let [Detective Fields] handle it from there." Tr. at 107; see also Tr. at 106. Sergeant Doherty testified he "had nothing to do with it after that." Tr. at 106. He was "nearby" when Ms. Williams signed the form, but he did not recall seeing her sign it. Tr. at 108.

At oral argument, the Government asserted that Ms. Williams's "recollection of the timing of [the] events [was] off," OA Tr. at 26, and urged the Court to credit Sergeant Doherty's testimony, OA Tr. at 16, 27. In support, the Government appeared to rely on Ms. Williams's relationship with Defendant, on the belief that Sergeant Doherty "had a good recollection of what happened that day," and on the fact that "he's a law enforcement officer." OA Tr. at 16, 19.[17]

_____

[17] As to Officer's Bailey recollection, counsel for the Government stated, "Officer Bailey[ ] . . . had . . . kind of the worst memory about what was happening that particular day, from my discussions with him and from the testimony that he presented to the Court." OA. Tr. at 18.

According to the Government's version of what happened, Officer Bailey yelled at and threatened Ms. Williams regarding only the consent form—after she had already given verbal consent to search the Apartment. OA Tr. at 27, 30, 31, 33-34. Specifically, the Government stated:

> [It is] the Government's position that Sergeant Doherty got the -- that she gave him verbal consent at that point, and that it was later, when that -- when Sergeant Doherty relayed that information to Detective Fields, and ultimately then Detective Fields made the decision that there needed to be the written consent, that that's when Officer Bailey came into the picture, and that's when he yelled at her.

OA Tr. at 30; see also OA Tr. at 27 (counsel confirming she thinks Ms. Williams was threatened to give written consent); OA Tr. at 33-34 (counsel asserting that after Ms. Williams provided verbal consent to search and when Officer Bailey was presenting her with the consent-to-search form, "that's when the situation occurred between Officer Bailey and Ms. Williams"). The Government does credit Ms. Williams when she "sa[id] that she felt threatened by what Officer Bailey said." OA Tr. at 31.

To accept the Government's proposed sequence of events, the undersigned would have to find, contrary to the great weight of the evidence, three things: 1) Ms. Williams mistakenly or purposely misrepresented what happened when she was asked for verbal consent; 2) Sergeant Doherty accurately and candidly recalled what happened when he was asking Ms. Williams for consent to search; and 3) Officer Bailey was truthful when he testified in essence that he was not present when Ms. Williams verbally consented. For the reasons set out below, the undersigned rejects the Government's suggested sequence of events, credits Ms. Williams's testimony in all material respects, and discredits portions of Sergeant Doherty's and Officer Bailey's respective testimony.

Ms. Williams's testimony regarding the circumstances surrounding her consent is credited in its entirety for multiple reasons. She was candid and forthcoming. She had a good memory. She did not exaggerate her testimony. Her testimony was internally consistent, unwavering, coherent, and detailed—particularly regarding the verbal consent conversation. Her testimony was consistent with that of Detective Fields on matters related to the circumstances of the arrest of Defendant and the search.[18] Detective Fields also testified consistently and credibly. Accordingly, the undersigned finds that while Sergeant Doherty was trying to explain to Ms. Williams why the officers needed to search the Apartment—and before she had given verbal consent—Officer Bailey interrupted Sergeant Doherty, became irate, and yelled at and threatened Ms. Williams.[19] Specifically, the undersigned finds that Officer Bailey told Ms. Williams that if she did not consent to the search, she would be charged with everything found in the Apartment. He told her that he was tired of her playing games and that she was "grown" and could make her own decisions. He did so while Ms. Williams was trying to speak with her mother over the phone. It was only after Officer Bailey yelled at and threatened Ms. Williams that she verbally consented to the search of the Apartment. In sum, the coercive and overbearing conduct of Officer Bailey occurred while law enforcement officers sought verbal consent from Ms. Williams, not when she was later presented with the consent-to-search form. Ms. Williams did not read the consent-to-search form, and she felt she had no choice but to sign it because she had given verbal consent.

---

[18]     As noted, Detective Fields did not witness the consent conversation.

[19]     Officer Bailey's abrupt interruption at the critical point when Sergeant Doherty was trying to explain to Ms. Williams why law enforcement needed to search the Apartment is likely the reason why Ms. Williams did not recall what Sergeant Doherty said to her at that time. See Tr. at 202, 226.

The undersigned discredits Sergeant Doherty's testimony that he did not hear any officer yell at or talk to Ms. Williams in an intimidating voice, and discredits Officer Bailey's testimony that he had no conversations with Ms. Williams about her consent to search other than what was on the consent-to-search form. Their testimony is discredited for a number of reasons. The overall impression was that they both had a poor memory and did not accurately recall certain matters. At times, it appeared that when they did not know the answer to a question, they said the first thing that popped into their minds, whether it was accurate or not. Other times, their demeanor was guarded and evasive, such that they did not impress the undersigned as witnesses who were telling the truth as to certain material facts. Also, there were numerous inconsistences between their testimony and that of Ms. Williams and Detective Fields (who testified consistently with each other on various points), as summarized above.

Specifically as to Sergeant Doherty, his testimony was hesitant and disjointed, and he did not appear to recall the verbal consent conversation at all without prompting by the Government. See Tr. at 90. Even then, his description of the conversation was fairly vague, see generally Tr. at 90-91, 105-06, to the point that the Court asked him if he had any recollection of the conversation, Tr. at 105 (asking, "Do you remember this at all, Sergeant?"). Indeed, when he was asked whether he advised Ms. Williams of her right to refuse consent, he conceded that he did not remember the "specific conversation." Tr. at 105. In light of Ms. Williams's credible testimony about Officer Bailey's conduct, it strains reason to believe that Sergeant Doherty did not hear him yell at or talk to Ms. Williams in an intimidating voice, see Tr. at 116, especially because Officer Bailey interrupted Sergeant

Doherty when he was asking Ms. Williams for her consent and trying to explain to her why they needed to search the Apartment, <u>see</u> Tr. at 202, 218, 226.

As to Officer Bailey, his testimony regarding how he knew that Ms. Williams had consented was somewhat hesitant. He actually started to testify in a manner that suggested he was part of the verbal consent conversation, but he quickly changed course: "Since <u>we had already</u> -- it been expressed that she had given verbal consent to search . . . ." Tr. at 172 (emphasis added). Officer Bailey's testimony with respect to the consent-to-search form was inconsistent with and directly contradicted by Detective Fields's testimony. As noted above, Officer Bailey testified that Detective Fields asked him to memorialize the verbal consent on a consent-to-search form. Tr. at 170. Detective Fields, on the other hand, testified that he did not speak with Officer Bailey on that day, Tr. at 154-55, and that he did not even know how law enforcement obtained the written consent, Tr. at 128. While Officer Bailey testified he knew on the day of the search he had the wrong form, Tr. at 172-73, Detective Fields testified twice that Officer Bailey told him he had <u>not</u> realized he used the wrong form, Tr. at 138, 155. Officer Bailey testified that on the day of the search, he told either a senior detective or "one of the supervisors" that he had the wrong form, Tr. at 172; but Detective Fields thought no one realized they had the wrong form, Tr. at 138. It is hard to believe if Officer Bailey reported this to someone in authority that nothing was done to remedy the mistake to the point that it even went "unnoticed" through Defendant's state court proceedings. <u>See</u> Tr. at 131.

Most importantly, there is no basis in fact for the Government's position that Officer Bailey yelled at and threatened Ms. Williams <u>after</u> she had given verbal consent. None of the witnesses testified to this. Indeed, Officer Bailey testified no one threatened or yelled at Ms.

Williams to get her to sign the consent-to-search form. Tr. at 176. In any event, it stretches the imagination to believe Officer Bailey used coercive measures to get her to sign the consent form, given that Ms. Williams asked no questions after she gave verbal consent, did not say she had changed her mind about consenting to the search, and thought she had no choice but to sign the form because she had already given consent. Tr. at 130, 175, 210-11. Further, there is no indication that Ms. Williams was confused about the timing of Officer Bailey becoming irate, yelling at her, and threatening her. To the contrary, as already found above, Ms. Williams's testimony regarding the verbal consent was candid, unwavering, detailed, and consistent.

The Government's reasons for asserting Ms. Williams's recollection was "off," OA Tr. at 26, (her relationship with Defendant, Sergeant Doherty's "good recollection," and the fact that Sergeant Doherty is a law enforcement officer, see OA Tr. at 16) are unpersuasive. The somewhat casual relationship between Ms. Williams and Defendant, see supra pp. 6-7, infra pp. 31-32, does not persuade the undersigned that Ms. Williams had a motive to lie under oath for Defendant or to purposely confuse the sequence of events to help Defendant. As to Sergeant Doherty, as above discussed, he did not appear to have a good recollection of what happened on the day of the search. In fact, his memory was so bad that the Court asked him if he remembered the consent conversation at all. Tr. at 105. His testimony was inconsistent with Detective Fields's and Ms. Williams's testimony on a number of points, and he did not mention, and evidently did not recall, the consent conversation until the Government prompted him by specifically asking him about it. See Tr. at 90. To the extent the Government relies on Sergeant Doherty's status as a law enforcement officer, it is

inappropriate for the Court to consider this in making credibility determinations. See Ramirez-Chilel, 289 F.3d at 749-50.

The undersigned now turns to what happened after Ms. Williams signed the consent-to-search form. Detective Fields and another detective went inside the Apartment with Ms. Williams after she signed the form. Tr. at 135 (Detective Fields's testimony); Tr. at 208 (Ms. Williams's testimony). Detective Fields testified,

> I wanted to bring Ms. Williams inside because it appeared she'd just gotten out of bed or -- it was still early morning and she was wearing pajamas and, you know, I didn't want to keep her outside, you know, sitting out on the curb wearing pajamas while the whole apartment complex stared down on her. I was trying to give her some dignity, take her back inside so she could seek some cover from all the witnesses who wanted to see what was going on.

Tr. at 135; see also Tr. at 164 (Detective Fields confirming on cross-examination that Ms. Williams was in a humiliating situation). According to Detective Fields, "it being an apartment complex, there's a good chance that people were standing in their breezeways or looking out their windows and whatnot." Tr. at 159. Ms. Williams confirmed that Detective Fields and the other detective wanted to take her "out of the spotlight of any particular neighbors that might be looking or anything that might embarrass" her. Tr. at 223. From the time Defendant exited the Apartment to the time Ms. Williams went inside the Apartment with the detectives, Ms. Williams had been outside for "maybe" about fifteen minutes. Tr. at 154; see also Tr. at 208 (Ms. Williams testifying she went inside the Apartment "[p]robably a few minutes" after she gave verbal consent to search).

Once inside the Apartment, the detectives sat Ms. Williams at her high-top kitchen table and asked her how long she had been dating Defendant. Tr. at 135. Ms. Williams told them they had started "talking" a few months prior. Tr. at 135-36. According to Detective

Fields, Ms. Williams said Defendant "would come over [to the Apartment] periodically, sometimes in the middle of the night, and he would leave the next day." Tr. at 136. She told them Defendant would also go to the Apartment "periodically when she would get off of work or if she would be home and he'd come over while she was there." Tr. at 162.

Ms. Williams remained at the kitchen table with the other detective while the search was conducted. Tr. at 136-37. The SWAT team did not participate in the search. Tr. at 142. From the kitchen table, according to Detective Fields, Ms. Williams could see into the master bedroom and into the side bedroom, but she could not see into "the closet or in the master bath[room]." Tr. at 136-37. Detective Fields testified that "she was in that central location where she had a pretty good view of every room in [the A]partment." Tr. at 137.

The officers found Defendant's Nike jacket in the master bedroom, "towards the foot of the bed." Tr. at 156; <u>see also</u> Tr. at 160. Additionally, a bag with money and jewelry was found in the closet in the master bedroom. Tr. at 156-57. Besides the Nike jacket, no men's clothing was found. Tr. at 160. According to Detective Fields, "[t]here was no sign of a male living there." Tr. at 160.

After the search was completed, Detective Fields asked Ms. Williams to complete a written statement describing the items found in the Apartment and indicating whether they were hers. Tr. at 157 (Detective Fields's testimony); Tr. at 211-12 (Ms. Williams's testimony). Detective Fields also wanted to memorialize in the written statement that Ms. Williams agreed to allow JSO to take her firearm for testing to ensure it was not involved in any crimes. Tr. at 139. Ms. Williams filled out the written statement at the kitchen table. Tr. at 139. According to the written statement, law enforcement found marijuana, a firearm in a toilet, and ammunition in the kitchen; these items did not belong to Ms. Williams. <u>See</u> Govt.'s

Ex. 5 (Doc. No. 51-8). The written statement incorrectly states Ms. Williams gave her consent to search the Apartment to Detective Fields. Tr. at 158; Govt.'s Ex. 5 (Doc. No. 51-8). As noted above, Detective Fields did not witness the consent conversation and was not present when the consent-to-search form was signed. Tr. at 153.[20]

## V. Discussion

As a preliminary matter, the undersigned addresses whether Defendant has standing to challenge the search. Then, the voluntariness of the consent is discussed.

## A. Standing

### 1. Parties' Positions

Defendant asserts he had a reasonable expectation of privacy in the Apartment as an overnight guest. Motion (Doc. No. 44) at 6; id. n.1 (citing Minnesota v. Olson, 495 U.S. 91, 96-97 (1990)). At oral argument, referring to evidence developed at the hearing, counsel for Defendant stated the following in favor of standing. Defendant "would often spend the night" at the Apartment "at least two times a week." OA Tr. at 6; see also Motion (Doc. No. 44) at 5. Defendant had "some clothes" in the Apartment and "a series of items" that law enforcement found in the Apartment. OA Tr. at 6; see also Motion (Doc. No. 44) at 5. Ms. Williams "trusted him with a key to the [A]partment." OA Tr. at 7.[21] According to counsel,

---

[20]     Toward the end of Detective Fields's direct examination, the Government asked him, "At any point when you were going back into the [A]partment with Ms. Williams or once you were back in the [A]partment, at any point did anyone tell her that she could be arrested if she didn't consent?" Tr. at 142. Detective Fields replied, "I did not hear that." Tr. at 142. It is unclear why the Government inquired of Detective Fields on this point, given that Ms. Williams had given her consent prior to going back into Apartment.

[21]     As noted previously, what Ms. Williams actually testified was that if Defendant spent the night at the Apartment and she had to go to work in the morning, she would leave Defendant a key to the Apartment so he could put it under the mat for her when she came back from work. Tr. at 194.

Defendant was "not simply someone [who] c[a]me over to play a game of cards." OA Tr. at 10.

The Government argues that "[D]efendant has not established a subjective expectation of privacy in [the A]partment, much less that society would recognize his alleged expectation of privacy as reasonable." Govt.'s Supp. Mem. (Doc. No. 64) at 9. The Government asserts that "[D]efendant's status equates to an occasional social guest of Ms. Williams, who, when arranged in advance with Ms. Williams, was allowed to enter [the A]partment temporarily—a far cry from having a possessory interest in and an unrestricted right of occupancy or custody and control of the [A]partment, with an ability to exclude others from the property." Id. According to the Government, "[D]efendant was 'merely present with the consent of the householder.'" Response (Doc. No. 49) at 3 (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)). The Government conceded at oral argument that Defendant was an overnight guest on the day of the search and that he had Ms. Williams's permission to spend the night at the Apartment. OA Tr. at 12-13. But, the Government nonetheless argued Defendant lacks standing and emphasized that Defendant could not be in the Apartment without Ms. Williams's permission. OA Tr. at 14.

### 2. Applicable Law

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (quoting Brown v. United States, 411 U.S. 223, 230 (1973))."Standing" is a shorthand reference for "the substantive question of whether or not the proponent of the motion to

suppress has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." Id. at 133. To have standing to challenge a warrantless search, a defendant must show he had a legitimate expectation of privacy in the property searched. Id. at 133-34. A subjective expectation of privacy is legitimate if "it is one that society is prepared to recognize as reasonable." Olson, 495 U.S. at 95-96 (internal quotation marks and citation omitted). "A legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy." United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008) (alteration in original) (citation omitted); see also United States v. Sarda-Villa, 760 F.2d 1232, 1235 (11th Cir. 1985) (recognizing that "[t]he legitimacy of the [defendant's] privacy claim is determined by an examination of the totality of the circumstances" (citation omitted)). "The accused bears the burden of demonstrating a legitimate expectation of privacy in the area searched." Harris, 526 F.3d at 1338 (citation omitted).

    "[L]ack of ownership [in the property searched] is not dispositive" of whether the defendant had a reasonable expectation of privacy in the property searched. United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted). Even if the defendant "does not own the property searched, he or she may nonetheless have a reasonable expectation of privacy in that place by virtue of his or her relationship with that place." Id. (citing Carter, 525 U.S. at 91). Although a person who is merely legitimately on the premises is not entitled to protection, see Carter, 525 U.S. at 90, an overnight guest in a third party's residence has a legitimate expectation of privacy in that residence, Olson, 495 U.S. at 96-100. In Olson, the United States Supreme Court explained,

To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society.

. . . .

From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings.

. . . .

That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. . . . The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household.

Id. at 98-99.

### 3. Analysis

The undersigned finds that Defendant had a legitimate expectation of privacy in the Apartment on the morning of the search and thus has standing to challenge the search. As noted, the Government does not dispute that Defendant was an overnight guest at the Apartment on the date in question. See OA Tr. at 12-13. Defendant went to the Apartment at about 10:00 PM or 11:00 PM the night before the day of the search, spent the night at the Apartment, and was present at the Apartment when law enforcement arrived. Tr. at 196 (Ms. Williams's testimony); Tr. at 156 (Detective Fields's testimony). Defendant was not "merely present with the consent of the householder," Carter, 525 U.S. at 90, as the Government argues, see Response (Doc. No. 49) at 3. Defendant was an overnight guest with a legitimate expectation of privacy, unlike someone who is merely present at someone else's

-36-

residence. See Olson 495 U.S. at 98-99; Carter, 525 U.S. at 90 (recognizing that "[w]hile an overnight guest may have a legitimate expectation of privacy in someone else's home, one who is merely present with the consent of the householder may not" (citations omitted)).

Although the Government concedes that Defendant was an overnight guest, it appears to demand a higher standard than that articulated by Olson. The Government's suggestion that Defendant lacked a legitimate expectation of privacy because he did not have "a possessory interest in and an unrestricted right of occupancy or custody and control of the [A]partment, with an ability to exclude others from the property," Govt.'s Supp. Mem. (Doc. No. 64) at 9, is unavailing. The Government apparently relies on United States v. Baron-Mantilla, 743 F.2d 868 (11th Cir. 1984); United States v. Brazel, 102 F.3d 1120 (11th Cir. 1997); and United States v. Merricks, 572 F. App'x 753 (11th Cir. 2014) for its position. See Govt.'s Supp. Mem. (Doc. No. 64) at 8-9. As discussed below, the Government's reliance on these cases is misplaced.

In Baron-Mantilla (a pre-Olson case), the United States Court of Appeals for the Eleventh Circuit found the defendant's testimony that he lived at the apartment searched was "unworthy of belief," stating that "the only credible evidence of [the defendant's] expectation of privacy in the apartment was the fact that he possessed a key to the apartment." Baron-Mantilla, 743 F.2d at 870. Thus, the Eleventh Circuit found the evidence was insufficient to establish standing. Id. Here, the Government does not contest Ms. Williams's testimony regarding Defendant's overnight stay at the Apartment, and the Court finds no reason to discredit such testimony. That Defendant did not actually live at the Apartment, did not pay rent or utilities, and did not have a key of his own are of no consequence; Olson

makes it clear that his status as an overnight guest "entitled [him] to a legitimate expectation of privacy despite the fact that [he] ha[d] no legal interest" in the Apartment. 495 U.S. at 99.

The facts in <u>Brazel</u> are wholly distinguishable from those present here. In <u>Brazel</u>, the defendant was arrested at his grandmother's house, where he apparently lived. 102 F.3d at 1148. The defendant challenged a search conducted at another residence (an apartment). <u>Id.</u> at 1147. The search occurred three days after the defendant's arrest and while he was in custody. <u>Id.</u> The Eleventh Circuit noted that although two witnesses referred to the apartment as "[the defendant's] apartment," neither testified that the defendant lived there regularly at the time of the search. <u>Id.</u> at 1148. The court also stated that another person leased the apartment and paid the rent and that it was unclear when the defendant lived at the apartment. <u>Id.</u> Although here Defendant did not live at the Apartment, he was an overnight guest on the morning of the search, unlike the defendant in <u>Brazel</u>, who was in custody and not even present at the apartment when the search took place.

In <u>Merricks</u>, the Eleventh Circuit merely stated that a defendant "<u>may</u> establish standing by demonstrating an unrestricted right of occupancy or custody and control of the premises searched . . . ." 572 F. App'x at 757 (emphasis added). It did not hold that such a showing was a requirement to establish standing. Further, and significantly, the Eleventh Circuit specifically observed that "[a]t the time of his arrest, [the defendant] was not an overnight guest; he had not stayed overnight at [the] house [searched] for at least three weeks." <u>Id.</u>

Additionally, the Government relies on <u>United States v. Haydel</u>, 649 F.2d 1152 (5th Cir. 1981) for the assertion that property ownership is "clearly" a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated. Govt.'s

Supp. Mem. (Doc. No. 64) at 7. <u>Haydel</u> was decided before <u>Olson</u>, and although property

ownership is a factor courts consider, it is not dispositive. <u>See</u> <u>Chaves</u>, 169 F.3d at 690;

<u>Haydel</u>, 649 F.2d at 1154-55 (recognizing that "property rights are neither the beginning nor

the end of (the) inquiry" (citation omitted)); <u>Merricks</u>, 572 F. App'x at 757 (recognizing that

"ownership is not required" to establish standing).[22]

  That Defendant could not have visitors at the Apartment when Ms. Williams was not

there and could go in the Apartment only when Ms. Williams was there to let him in does not

change the undersigned's finding. Indeed, <u>Olson</u> recognizes that "few houseguests will invite

others to visit them while they are guests without consulting their hosts." <u>Olson</u>, 495 U.S. at

99; <u>see also</u> <u>id.</u> at 99-100 (commenting that "[i]f the untrammeled power to admit and

exclude were essential to Fourth Amendment protection, an adult daughter temporarily living

in the home of her parents would have no legitimate expectation of privacy because her right

to admit or exclude would be subject to her parents' veto"). Moreover, that Defendant was

present at the Apartment with Ms. Williams's permission actually supports a finding of

---

[22]   The Government relies on a number of other cases that are also distinguishable from this case or otherwise unpersuasive. <u>See</u> <u>United States v. Maxi</u>, 886 F.3d 1318, 1326 (11th Cir. 2018) (finding that the defendant who had paid rent at the residence searched, had a key, had been living there "intermittently for three to six months," kept important papers there, and had been kicked out of his father's house was "<u>more than</u> just an overnight guest—he was effectively a subtenant" (emphasis added)); <u>United States v. Miller</u>, 387 F. App'x 949, 951-52 (11th Cir. 2010) (finding that the defendant had no expectation of privacy in apartment where he paid rent for one month on behalf of apartment's tenants, the defendant was seen at the property only three times, and the defendant was unable to identify photos of the apartment at suppression hearing); <u>United States v. Hunt</u>, No. 2:07-cr-284-WKW, 2008 WL 4080770, at *3 (M.D. Ala. Sept. 3, 2008) (unpublished) (finding that the defendant was not [at the house searched] to sleep over at the house,[ ] but rather, up all night smoking crack and marijuana and watching television, and had just fallen asleep before the officers arrived"); <u>United States v. Mainor</u>, No. 3:04-cr-206-J-20MCR, 2005 WL 8141712, at *2-3 (M.D. Fla. Feb. 14, 2005) (unpublished report and recommendation) (finding that the defendant had no standing; stating the defendant would sometimes "come over to the apartment to help care for his brother and that [the d]efendant normally visited two or three times [per] week"; not indicating whether the defendant was an overnight guest at the apartment), <u>adopted</u>, No. 3:04-cr-206-J-20MCR, 2005 WL 8141713 (M.D. Fla. May 16, 2005) (unpublished order); <u>United States v. Puliese</u>, 671 F. Supp. 1353, 1358-61 (S.D. Fla. 1987) (pre-<u>Olson</u> case).

standing. See id. at 99 (stating the overnight guest "is there with the permission of his host, who is willing to share his house and his privacy with his guest"); cf. United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1342-43 (N.D. Ga. 2009) (finding that the defendants lacked standing because they "presented no evidence that anyone with authority to do so gave them permission to stay as guests in the residence").

Based on the uncontroverted evidence presented at the suppression hearing, the undersigned finds that Defendant has standing to challenge the search of the Apartment because, as an overnight guest, he had a legitimate expectation of privacy in the Apartment. See Olson, 495 U.S. at 98-100.

**B. Voluntariness of Consent**

### 1. Parties' Positions

Defendant argues that "[t]he evidence adduced at the evidentiary hearing showed that Ms. Williams'[s] consent to search [the A]partment was not voluntary." Def.'s Supp. Mem. (Doc. No. 63) at 1. According to Defendant, "each officer recited a different story about what happened the morning of the search of [the A]partment." Id. Defendant contends Ms. Williams's consent was involuntary, given "the totality of the circumstances as described at the hearing, the lack of credibility of [O]fficer Bailey, and Ms. Williams'[s] testimony that she was pressured by Officer Bailey to consent to the search of [the A]partment and was not advised she had the right to refuse consent . . . ." Id. at 4.

Responding, the Government asserts that "[t]he testimony at the suppression hearing clearly established that Ms. Williams voluntarily provided verbal consent to search [the A]partment to [Sergeant] Doherty, which he then relayed to [Detective] Fields." Govt.'s Supp. Mem. (Doc. No. 64) at 17. Citing United States v. Long, 866 F.2d 402 (11th Cir. 1989) and

United States v. Espinosa-Orlando, 704 F.2d 507 (11th Cir. 1983), the Government argues that "[t]here are cases within this circuit that have approved a finding of voluntariness when the individual providing consent was under far more coercive conditions than an officer raising his voice as alleged in the instant case." Id. at 18; see id. at 18-20. In making these arguments, the Government apparently relies on its position that any coercive tactics by Officer Bailey were employed after Ms. Williams had given verbal consent. See supra p. 26. Having rejected the Government's sequence of events and having found that Officer Bailey yelled at and threatened Ms. Williams before she gave verbal consent, see supra pp. 26-31, the undersigned focuses on whether the consent was voluntary under the facts as found above.

### 2. Applicable Law

A warrantless search is "per se unreasonable under the Fourth Amendment[ ]—subject only to a few specifically and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967); see also Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). One of the "established exceptions" to the warrant requirement is a search "conducted pursuant to consent." Schneckloth, 412 U.S. at 219 (citing Davis v. United States, 328 U.S. 582, 593-94 (1946); Zap v. United States, 328 U.S. 624, 630 (1946)); see also United States v. Dunkley, 911 F.2d 522, 525 (11th Cir. 1990) (stating that "[a] search of property, without warrant or probable cause, is proper under the Fourth Amendment when preceded by valid consent" (citation omitted)). A person's consent for law enforcement to search his or her property will be considered valid "so long as the consent is voluntary." United States v. Kapperman, 764 F.2d 786, 793 (11th Cir. 1985) (citation omitted).

-41-

Consent is voluntary when it is "the product of an 'essentially free and unconstrained choice.'" United States v. Spivey, 861 F.3d 1207, 1213 (11th Cir. 2017) (quoting United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001)), cert. denied, 138 S. Ct. 2620 (2018). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984) (alteration in original) (citation omitted), reh'g granted, 741 F.2d 1346 (11th Cir. 1984) (en banc), sua sponte reinstated without reh'g, 764 F.2d 747 (11th Cir. 1985). "In analyzing the totality of the circumstances, there is no one factor that controls." Spivey, 861 F.3d at 1220 (citation omitted). "Relevant factors include the 'voluntariness of the [consenting party's] custodial status, the presence of coercive police procedure, the extent and level of [the consenting party's] cooperation with the police, the [consenting party's] awareness of h[er] right to refuse to consent to search, the [consenting party's] education and intelligence, and, significantly, the [consenting party's] belief that no incriminating evidence will be found.'" Id. at 1213 (quoting Chemaly, 741 F.2d at 1352).

In determining whether consent was coerced, the court must consider "subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." Schneckloth, 412 U.S. at 229. The "failure to advise one asked to consent that he has a right to refuse to consent will not invalidate an otherwise valid consent to search." United States v. Bushay, 859 F. Supp. 2d 1335, 1368 (N.D. Ga. 2012) (citing United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004)). The government has the burden of proving that the person's consent to search "was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." United States v. Blake, 888

-42-

F.2d 795, 798 (11th Cir. 1989) (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also Spivey, 861 F.3d at 1220.

**3. Analysis**

Based on the totality of the circumstances and having considered the relevant factors set out in Spivey, the undersigned finds that Ms. Williams's consent was not voluntary. This finding includes consideration of the following taken together: 1) Ms. Williams's custodial status; 2) Ms. Williams's level of cooperation with the officers; 3) the use of strong coercive police tactics; 4) the large law enforcement presence at the scene; 5) the humiliating nature of the encounter; 6) Ms. Williams's belief that incriminating evidence would be found; 7) Ms. Williams's level of education and intelligence; 8) Ms. Williams's lack of experience with law enforcement; and 9) Ms. Williams's lack of awareness that she could refuse to consent. Ms. Williams's education and level of cooperation with police are insufficient to render her consent voluntary in light of the other factors and circumstances as discussed below. Overall, Ms. Williams's consent was the product of duress and coercion, rather than one of free will.

As to the voluntariness of Ms. Williams's custodial status, Sergeant Doherty testified Ms. Williams was not free to leave, Tr. at 114, and Ms. Williams stated she did not feel free to discontinue the conversation and leave, Tr. at 227. Ms. Williams's custodial status was involuntary, even though she was not physically restrained. See Tr. at 114.

Regarding Ms. Williams's cooperativeness with law enforcement, Sergeant Doherty and Detective Fields testified that Ms. Williams was cooperative with them. Tr. at 116 (Sergeant Doherty's testimony); Tr. at 159 (Detective Fields's testimony). Clearly, Officer

Bailey viewed Ms. Williams's hesitancy to consent as less than fully cooperative, triggering his forceful intervention.

As to the coerciveness of the officers' conduct, the evidence shows Officer Bailey's conduct toward Ms. Williams was hostile and overbearing, and his statements were coercive, threatening, and abusive. Officer Bailey did not just "raise[ ] his voice," as the Government contends. Govt.'s Supp. Mem. (Doc. No. 64) at 17, 19. Ms. Williams's credible and unwavering testimony shows that Officer Bailey was irate, yelled at Ms. Williams multiple times, and threatened her. He was screaming and "trying to initiate the search." Tr. at 204. He yelled at her that he was tired of her playing games with them. Tr. at 216. He essentially threatened her with criminal charges if she did not consent; specifically, that she would be charged with everything they found in the Apartment. Tr. at 205. Further, apparently because Ms. Williams was on the phone with her mother, Officer Bailey ridiculed her, telling her she was "grown" and could "make [her] own decisions." Tr. at 206; see also Tr. at 205. Ms. Williams testified she felt pressured and believed Officer Bailey was angry because he thought she was taking too long to consent. Tr. at 205, 226. Ms. Williams stated that Officer Bailey "made [her] feel as though [she] had to" consent to the search. Tr. at 225. Ms. Williams specifically testified, "I mean, once [Officer Bailey] was -- you know, started yelling and everything, so at that point I'm nervous. I don't really know what to do. So I just said, 'Go ahead and search.'" Tr. at 204.

Moreover, Officer Bailey's threat that Ms. Williams would be charged with everything found in the Apartment, when considered together with the frenzied nature of the situation, could arguably be viewed as an implied false claim of authority that he could immediately search the Apartment with or without her consent. See Blake, 888 F.2d at 798 (recognizing

-44-

government must prove consent "was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily").[23] This claim was false because law enforcement apparently had no other lawful means of searching the Apartment at the time. See Tr. at 153 (Detective Fields acknowledging there was no probable cause to search the Apartment). Officer Bailey's threat essentially boiled down to two options: 1) the officers could search the Apartment with her consent, and she would not be charged with anything; or 2) the officers could still search the Apartment without her consent, but she would be charged with anything they found. Indeed, Ms. Williams testified that after Officer Bailey yelled at and threatened her, she felt like she "had to" consent. Tr. at 225.

That Sergeant Doherty was using a conversational tone with Ms. Williams and trying to calmly explain to her why they needed to search the Apartment, Tr. at 91, 116, is of no consequence. Officer Bailey interrupted Sergeant Doherty's calm explanation and began yelling at and threatening Ms. Williams. Tr. at 202, 204, 206, 218, 226. Officer Bailey's conduct greatly escalated an already tense and "[v]ery stressful" situation, Tr. at 205, at the critical point when Ms. Williams was trying to decide whether to consent to the search. Likewise, that other officers talked to her in a "calm tone of voice," Tr. at 222, does not offset Officer Bailey's hostile conduct, aggressive tone, and threat to charge her with everything found in the Apartment.

Notably, at oral argument, the Court asked counsel for the Government whether Ms. Williams's consent would be rendered involuntary if Officer Bailey made the statements when law enforcement was seeking Ms. Williams's verbal consent. OA Tr. at 84. Counsel

---

[23]     Even if Officer Bailey's threat did not amount to a false claim of authority, the totality of the circumstances, as discussed herein, nonetheless render Ms. Williams's consent involuntary.

responded, "If those were the exact facts, then I would say most likely it would." OA Tr. at 84. The Government also conceded that Ms. Williams's testimony "that she felt threatened by what Officer Bailey said" is believable. OA Tr. at 31.

In some cases in which courts have found a defendant's or a third party's consent to be voluntary, the courts have specifically noted the absence of threats and aggressive tone. See United States v. Drayton, 536 U.S. 194, 204 (2002) (concluding an encounter was not coercive because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice"); United States v. Diaz Lizaraza, 981 F.2d 1216, 1222 n.3 (11th Cir. 1993) (alternatively finding officers did not coerce the defendant to consent in part because there were no threats or "abusive language"); United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (finding consent to search voluntary in part because the defendant was not in custody and officers did not raise their voices, draw their guns, or otherwise threaten or coerce); United States v. Silva-Arzeta, 602 F.3d 1208, 1214-15 (10th Cir. 2010) (consent to search voluntary, even though the defendant was handcuffed, in part because there was no evidence that threats were used, officers did not use "aggressive or insisting tone," and officers did not "convey[ ] in any way to [the defendant] that he was obligated to allow the search"); United States v. Wilson, 605 F.3d 985, 1028 (D.C. Cir. 2010) (finding consent to search voluntary and noting that officers avoided use of threats); United States v. Price, 558 F.3d 270, 274, 278 (3d Cir. 2009) (finding consent to search voluntary and noting that "[o]fficers did not tell [the defendant's wife] that anything found could incriminate her" and that she was not verbally threatened (emphasis added)).

-46-

In addition to the coerciveness of Officer Bailey's conduct, the area around the Apartment was dominated by police. See United States v. Holmes, No. 1:06-cr-109-BBM, 2008 WL 11460721, at *3 (N.D. Ga. June 20, 2008) (unpublished) (noting the defendant "was bombarded with three armed officers within seconds of opening the door" and recognizing that "[o]ther courts have considered the presence of several officers and the display of weapons as a factor undermining the voluntariness of a consent to search" (citing United States v. Sawyer, 441 F.3d 890, 895 (10th Cir. 2006); United States v. Groves, 470 F.3d 311, 322 (7th Cir. 2006)). Here, at least ten or fifteen law enforcement officers were at the scene. Tr. at 78, 96, 152-53. The members of the SWAT team each wore a black vest that "typically" has one or two magazines on the front, a gun belt, a pistol, additional magazines, a Taser, and an AR-15 rifle. Tr. at 96. The officers' weapons were noticeable, and Ms. Williams testified the officers had "[b]ig guns." Tr. at 219. Ms. Williams stated that before she exited the Apartment, she looked outside the window and saw "guns pointed at the [Apartment]." Tr. at 216. The apprehension unit that first met with Ms. Williams when she exited the Apartment consisted of four to five officers, who were all armed with pistols and rifles. Tr. at 109-10.The officers did not point any weapons directly at Ms. Williams, see Tr. at 222, but when she exited the Apartment, the officers were holding their rifles in a low ready position, Tr. at 108-11, clearly displaying them.[24] The brandishing of weapons when

---

[24] Courts finding consent voluntary have often stressed that no weapons were displayed. See, e.g., Drayton, 536 U.S. at 204 (noting there was "no brandishing of weapons"); Pineiro, 389 F.3d at 1362 (noting that officers "were armed, but their weapons were concealed" when they approached the defendant's vehicle); United States v. Bass,661 F.3d 1299, 1304 (10th Cir. 2011) (noting that "officers did not draw their guns or raise their voices"); United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (noting that "officers did not . . . draw their guns"); Price, 558 F.3d at 278 (noting that "officers did not have their guns drawn when they asked for . . . consent"); United States v. Moon, 513 F.3d 527, 537 (6th Cir. 2008) (noting investigators entered the defendant's office with "weapons concealed"); United States v. Hernandez, 279 F.3d 302, 308 (5th Cir. 2002) (noting officer "did not display a weapon"); United States v. Laine, 270 F.3d 71, 75 (1st Cir. 2001) (noting that (continued...)

Ms. Williams exited the Apartment, although not a singular decisive factor because there was no testimony indicating the officers displayed their weapons while asking for her consent, nonetheless contributed to the coercive atmosphere on that day.

Intertwined with Officer Bailey's abusive conduct and the intimidating environment created by the large police presence is the fact that the entire situation was humiliating for Ms. Williams. Tr. at 219. Ms. Williams was in her pajamas, which Detective Fields described as a "T-shirt and a pair of shorts, like ladies' short-shorts that they wear for comfort to bed." Tr. at 165. Ms. Williams testified she felt embarrassed and humiliated that her neighbors were witnessing the events of that day. Tr. at 219. Detective Fields testified he brought her inside the Apartment to "give her some dignity . . . so she could seek some cover from all the witnesses who wanted to see what was going on." Tr. at 135; see also Tr. at 223 (Ms. Williams confirming that Detective Fields and another detective wanted to take her "out of the spotlight of any particular neighbors that might be looking").

Significantly, as to whether Ms. Williams believed that incriminating evidence would be found, see Spivey, 861 F.3d at 1213, Ms. Williams testified she knew Defendant had marijuana in the Apartment, and she was "sure there would have been some disciplinary action" from her employer had she been charged with possession of marijuana, Tr. at 214. She confirmed she could risk losing her nursing license if she were convicted of a drug crime. Tr. at 214. This, combined with Officer Bailey's threat that Ms. Williams would be

---

[24](...continued)
"[n]o weapons were brandished"); United States v. Sanchez-Valderuten, 11 F.3d 985, 990 (10th Cir.1993) (noting that officer "did not wield any weapons"); United States v. Rice, 995 F.2d 719, 724 (7th Cir. 1993) (noting that "officers did not display weapons").

charged with everything they found in the Apartment if she did not consent, strongly supports the finding that Ms. Williams's consent was not voluntary.

Regarding Ms. Williams's education and intelligence, Ms. Williams is well-educated. She earned a bachelor's degree in nursing, is a registered nurse at UF Health, and has been employed as a nurse for two and a half years. Tr. at 183-84. She was about twenty-six to twenty-seven years old on the day of the search. See Tr. at 183 (testifying she was twenty-seven years old at the time of the hearing, which was held about ten months after the search). Ms. Williams, however, had not been in criminal trouble before, Tr. at 214, and had never had an interaction with law enforcement like the one she had on the day of the search, Tr. at 201. Indeed, she had never "dealt with this" and did not know what to do. Tr. at 205. Although a high level of education may sometimes overcome circumstances that would otherwise render consent involuntary, United States v. Mendenhall, 446 U.S. 544, 558 (1980), this is not the case here. The strong coercive nature of Officer Bailey's threat and the rest of the circumstances, as described herein, nullified the impact that Ms. Williams's education and maturity had on her ability to make a decision of her own free will. Cf. id. (finding consent voluntary and noting that it was given by a 22-year-old with an eleventh grade education who was "plainly capable of a knowing consent," but that "[t]here were neither threats nor any show of force" (emphasis added)). In fact, Ms. Williams's efforts to make an educated decision (asking Sergeant Doherty why they needed to search the Apartment and calling her mother) were abruptly interrupted and thwarted by Officer Bailey.

As to whether Ms. Williams was aware, before giving verbal consent, that she could refuse to consent to the search, it appears that she was not. It seems Ms. Williams was not apprised of her right to refuse consent before she verbally consented. When Sergeant

Doherty was asked whether he informed Ms. Williams of her right to refuse consent, he said he did not remember the "specific conversation," but he thought he just asked her if they could search the Apartment. Tr. at 105. Detective Fields testified he did not advise Ms. Williams she had a right to refuse consent. Tr. at 153. Moreover, as noted, Ms. Williams did not feel free to discontinue the conversation and leave. Tr. at 227. It is reasonable to infer that Ms. Williams was unaware of her right to refuse consent because she did not even think she could abandon the conversation. Additionally, her lack of experience with law enforcement indicates that she was not aware she could refuse to consent, notwithstanding her education level. In light of the above, the undersigned finds that Ms. Williams was unaware of her right to refuse consent.

The fact that Ms. Williams signed a consent-to-search form and initialed the section of the form stating she had the right to refuse consent to the search of the Apartment does not cure the involuntariness of her prior verbal consent. Her written consent and that section of the form were rendered meaningless by the overall circumstances as found above, especially Officer Bailey's hostile conduct, aggressive tone, and threat that she would be charged with everything found in the Apartment if she did not consent. Moreover, Officer Bailey testified he told Ms. Williams that "she would <u>have</u> to sign" the form, Tr. at 174 (emphasis added), not that she could sign the form if she wanted to consent to the search of the Apartment. Ms. Williams testified she felt she had no choice but to sign the form. <u>See</u> Tr. at 210-11 (testifying, "at that point they had already -- I had already said verbally, 'You can go ahead and consent [sic],' after everything had [taken] place. So I figured I had no choice, but -- I mean, I'd already let them search"). According to Ms. Williams, she did not

even read the form, and she "just remember[ed] them saying 'Sign here, sign there.'" Tr. at 210.[25]

Additionally, that Detective Fields told Ms. Williams he would search the Apartment based on her consent, Tr. at 131-33, that Ms. Williams said nothing in response, and that his impression was that she was "open to" the search and had no questions, Tr. at 128, 130, does not cure the involuntariness of her verbal consent. Detective Fields did not ask Ms. Williams for her consent to search; rather, he asserted that he was going to search the Apartment based on her consent. In any event, by the time Detective Fields spoke with Ms. Williams, she had already been coerced to verbally consent to the search and felt she no longer had a choice in the matter. See Tr. at 210-11.

The Government's reliance on Long and Espinosa-Orlando to argue that courts in the Eleventh Circuit have found consent voluntary in "far more coercive conditions" than those here is misplaced. Govt.'s Supp. Mem. (Doc. No. 64) at 18.[26] The coercive tactics used by Officer Bailey were actually far worse than what happened in Long and Espinosa-Orlando.

In Long, the defendant argued that his consent to the search of his property was not voluntary, in part, because the officers told him that if he did not consent, "they would return and 'dig the place up.'" 866 F.2d at 404. The Eleventh Circuit rejected this argument, finding there was "no evidence in the record of threat or force." Id. at 405. The Court observed that

---

[25]     The Government does not suggest that the form cured any possible involuntariness of the verbal consent; indeed, the Government argues that Officer Bailey yelled at and threatened Ms. Williams only when she was presented with the form. Even under the Government's proposed sequence of events—which the undersigned rejects entirely—the statement on the form indicating Ms. Williams had the right to refuse consent would have likewise been rendered meaningless by Officer Bailey's threat (made when she was asked to sign the form, according to the Government) and the rest of the circumstances as described above.

[26]     As noted, in citing these cases, the Government was apparently relying on its theory that Officer Bailey yelled at and threatened Ms. Williams after she had given verbal consent. Nonetheless, the undersigned discusses these cases as applicable to the facts as found above.

the defendant, "without any request or promise on the part of the officers, . . . led the agents to a mattress, out by an oak tree, under which the [contraband] was buried." Id. According to the Court, "Even if the officers stated that they could come back and 'dig the place up,' such a statement does not amount to coercion." Id.

Here, Officer Bailey did not just "raise[ ] his voice," as the Government suggests. Govt.'s Supp. Mem. (Doc. No. 64) at 17, 19. Officer Bailey was "irate"; he yelled at Ms. Williams he was tired of her playing games with them, threatened her that she would be charged with everything found in the Apartment, and pressured her to the point she felt she had no other choice but to consent. Tr. at 202, 204-06, 216, 218, 226.

In Espinosa-Orlando, the defendant was asked for consent to search his vehicle while he was lying down on the grass at the "request[ ]" of law enforcement. 704 F.2d at 510. Specifically, the officer "took the keys from the [defendant's vehicle], knelt before [the defendant], and asked him in a conversational tone,[ ] 'Are these your keys?'" Id. When the defendant responded that they were, the officer "then asked[,] 'Do I have your permission to look in, to open the trunk of your car and look inside the suitcase?'" and [the defendant] answered, 'Yes, yes.'" Id. Unlike Ms. Williams, the defendant in Espinosa-Orlando was not yelled at or threatened. Instead, an officer asked him in a conversational tone for his consent, and no one interrupted that officer by yelling and threatening the defendant. Notably, the court specifically observed that although the defendant was lying on the ground when he gave consent, "no abusive language or physical threats were at any time directed at" the defendant. Id. at 513.

Considering the totality of the circumstances, including the relevant factors set out in Spivey, Ms. Williams's consent was not voluntary.

-52-

## VI. Conclusion

Defendant has standing to challenge the search, and the Government failed to carry its burden of proving that Ms. Williams's consent was given freely and voluntarily. Accordingly, the undersigned recommends that all incriminating evidence found during the search of the Apartment be suppressed. After due consideration, it is

**RECOMMENDED**:

1.      That Defendant's Amended Motion to Suppress Fruits of Search of 6680 Bennett Creek Drive, Apartment 617 (Doc. No. 44) be **GRANTED**.

2.      That the fruits of the January 16, 2018 search of 6680 Bennett Creek Drive, Apartment 617, Jacksonville, FL (including the firearm found in the toilet and ammunition) be **SUPPRESSED**.[27]

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on July 16, 2019.

*James R. Klindt*
**JAMES R. KLINDT**
United States Magistrate Judge

bhc
Copies:

Honorable Harvey E. Schlesinger
United States District Judge

Assistant U.S. Attorney (Hackenberry)
William Mallory Kent, Esquire
Ryan Edward McFarland, Esquire
Darcy D. Galnor, Esquire

---

[27]      In the Motion, Defendant seeks to suppress "the evidence obtained from a warrantless search of . . . 6680 Bennett Creek Drive, Apartment 617, Jacksonville, Florida, including, but not limited to, the Glock .40 caliber pistol, serial number FKN368, and 21 rounds of .40 caliber ammunition, which is the subject of the indictment in this case." Motion (Doc. No. 44) at 1 (citation omitted).

-53-